UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| FARES PAWN, LLC, and | ) | |
| WILLIAM K. SAALWAECHTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 3:11-cv-136-RLY-WGH |
| vs. | ) | |
| | ) | |
| STATE OF INDIANA, | ) | |
| DEPARTMENT OF FINANCIAL | ) | |
| INSTITUTIONS, CONSUMER CREDIT | ) | |
| DIVISION; | ) | |
| JOHN SCHROEDER, Individually, and as | ) | |
| an employee with the Department of | ) | |
| Financial Institutions; | ) | |
| MARK TARPEY, Individually, and as an | ) | |
| employee with the Department of Financial | ) | |
| Institutions; and DAVID H. MILLS, | ) | |
| Individually, and as an employee with the | ) | |
| Department of Financial Institutions, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Fares Pawn, LLC and William Saalwaechter, filed suit against

Defendants, State of Indiana, the Indiana Department of Financial Institutions, Consumer

Credit Division ("DFI" and collectively, the "State Defendants"), and John Schroeder,

Mark Tarpey, and David Mills (collectively, "the Individual Defendants"), in their

individual and official DFI capacities.  Plaintiffs allege that the Individual Defendants'

respective roles in the DFI Board's initial denial of Plaintiffs' pawnbroker application

violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

1

Consequently, they are personally liable for Plaintiffs' damages under 42 U.S.C. § 1983

("Section 1983").  Plaintiffs also allege that the State Defendants' unreasonable delay in

rendering a decision on their application, and their subsequent denial of their pawnbroker

application, constituted intentional infliction of emotional distress and intentional

interference with business relations.  Defendants now move for summary judgment.  For

the reasons set forth below, their motion is **GRANTED**.

## I.      Undisputed Material Facts and Law

This case involves the application process one must undertake in order to be

issued a pawnbroker license in the State of Indiana.  Before addressing the facts, a brief

overview of the statutory application process is worth noting.

### A.      Regulatory Process

Pawn shops are regulated in the State of Indiana by the DFI, and a license issued

by the DFI is necessary in order to operate one.  IND. CODE § 28-7-5-3(a).   During the

license application process, the DFI first investigates and gathers information about the

applicant.  When the investigation and information gathering is complete, the Director

may approve the application unilaterally under his or her delegated authority.  If the

application is not approved by the Director, it is considered and voted on by the full DFI

Board.  (*See* Plaintiffs' Ex. 25; Deposition of Judith Ripley ("Ripley Dep.") at 42-47).  If

an applicant's and the applicant's proposed manager's financial standing, competence,

business experience, and character convince the DFI Director or DFI Board that the

business will be operated honestly, fairly, efficiently, and in the public interest, the DFI

"shall issue and deliver a license to the applicant."  IND. CODE § 28-7-5-8(a).  While normally the DFI Director may only approve an application or refer it to the full DFI Board, the Director may unilaterally deny any straw license application, defined as an application "submitted for the benefit of, or on behalf of a person who does not qualify for a license."  IND. CODE § 28-7-5-8(c).

DFI is statutorily required to revoke a license if the pawnbroker has, for example: (1) violated Indiana law or a DFI rule, order, or guidance document; (2) obtained the license for the benefit of, or on behalf of, a person who does not qualify for the license; (3) knowingly made material misrepresentations to, or concealed material information from, the DFI; and (4) if "facts and conditions exist that, had they existed at the time the licensee applied for the license, would have been grounds for the department to deny the license."  IND. CODE § 28-7-5-13(c).  While a pawnbroker license is not transferable or assignable, the DFI may "appoint a liquidating agent to conclude the affairs of the licensee's pawnbroker business in Indiana."  IND. CODE § 28-7-5 -9, 10.1(b).

### B.    Pre-Application History

The Fares Avenue property has an unusual and complex history.  In 1996, Terry and Linda Dukes opened Fares Loans at 1432 North Fares Avenue in Evansville, Indiana.  (Plaintiffs' Ex. 28 at 2).  Over the years, Fares Loans was cited by the DFI for alleged criminal activity, including allegations that the manager received stolen goods, which resulted, among other things, in the DFI ordering the Dukes to terminate the manager of Fares Loans.  (*Id.*).

In 2007, Saalwaechter purchased the Fares Avenue property from the Dukes. (December 13, 2011 Deposition of William K. Saalwaechter ("2011 Saalwaechter Dep.") at 103; Plaintiffs' Ex. J). To Saalwaechter's surprise, he did not purchase the pawn business or its goodwill, nor did he own anything related to the business besides the real estate as of October 31, 2007. (Defendants' Ex. J; September 25, 2012 Deposition of William K. Saalwaechter ("2012 Saalwaechter Dep.") at 36). Unbeknownst to Saalwaechter, his attorney, Tom Carroll, acquired Dukes' pawnbroker business through his company, Evansville Pawn, LLC, in a separate transaction. (Defendants' Ex. J at 1). Brian Kamuf, who was operating the pawn shop under the Dukes' license, was to pay Saalwaechter rent in order to maintain an option to buy the property from Saalwaechter. (*Id.*; 2012 Saalwaechter Dep. at 23, 31). Saalwaechter only intended to own the property until Kamuf executed his option. (2012 Saalwaechter Dep. at 24-25).

On November 13, 2007, Carroll applied to DFI for a pawn license to operate Evansville Pawn on the property, designating John Jones as his proposed manager. (Plaintiffs' Ex. 2 at 3; 2012 Saalwaechter Dep. at 30-31). During the pre-licensing interview, Carroll assured the DFI that the Dukes would have no involvement in his pawn business. (Plaintiffs' Ex. 28 at 2). In addition, Jones, who is apparently the brother of Linda Dukes, (*see id.*), previously worked for them at Fares Pawn, as evidenced by a February 2007 letter Linda Dukes wrote to the DFI, informing the DFI that "[Jones] had a former charge which has been amended to a Class A misdemeanor." (Plaintiffs' Ex. 5). In actual fact, Jones had pled guilty in Spencer County, Indiana, to felony theft of large amounts of anhydrous ammonia in 2004 and to other felony drug charges. These

4

convictions were reduced to misdemeanors in 2006. (Plaintiffs' Ex. 5; Plaintiffs' Ex. 25 at 47-48; Defendants' Ex. M at 47-48). DFI did not become aware of those specific charges until 2009. (Deposition of Mark Tarpey ("Tarpey Dep.") at 37, 39). According to the DFI Consumer Credit Division Supervisor, Mark Tarpey, "The state police criminal background check we had didn't show anything." (*Id*.).

The DFI granted Carroll a pawnbroker license, with Jones as the approved manager, on December 19, 2007. (Plaintiffs' Ex. 2 at 4). However, in July of 2008, the DFI received materials from Brian Kamuf's brother, Jeremy Kamuf, indicating that Carroll procured the license for Jeremy's benefit. (2012 Saalwaechter Dep. at 27-29; Plaintiffs' Ex. 28 at 2). Because the business was not licensed to Jeremy, the DFI concluded that Evansville Pawn was operating an illegal "straw license." (Plaintiffs' Ex. 28 at 2).

On October 30, 2008, Tarpey and John Schroeder, the DFI Deputy Consumer Credit Division Supervisor and General Counsel, met with Carroll and Jones to discuss revoking Carroll's pawnbroker license. (Plaintiffs' Ex. 2 at 5). On January 16, 2009, Carroll and the DFI agreed to let Evansville Pawn's license expire on May 31, 2009. (*Id*. at 7). Under Indiana law, Evansville Pawn was therefore required to liquidate its pawns. IND. CODE § 28-7-5-10.1.

## C.     Application Process

On March 30, 2009, Saalwaechter applied for a pawn license for the property, listing "Fares Pawn LLC" as the pawnbroker business. (2012 Saalwaechter Dep. at 65; Defendants' Ex. G at 1). He listed Jones as his manager, as Jones was the only person he

knew who had the requisite two years finance-related experience to serve as manager. (2012 Saalwaechter Dep. at 21, 92-93; Defendants' Ex. G at 4).  On April 9, 2009, Tarpey sent Saalwaechter a letter listing the items that Saalwaechter would need to provide in order to process his application, including proof of property and casualty insurance, and proper fingerprint cards for DFI to complete a criminal background check, to be conducted by the Federal Bureau of Investigation ("FBI")[1].  (Defendants' Ex. H at 1).  Saalwaechter did not promptly submit the required items, and he failed to submit proper fingerprint cards.  (2012 Saalwaechter Dep. at 115-16).

On May 13, 2009, Saalwaechter opened Fares Pawn on the property, operating it as a buy-sell business, not a pawn shop.  (*Id*. at 69).  During this same time frame, Saalwaechter and Carroll entered into a settlement agreement to resolve their dispute over the Fares Avenue property.  The agreement provided, in part, that Saalwaechter and Fares Pawn would supervise the liquidation of Evansville Pawn's pawns and keep the proceeds. (Plaintiffs' Ex. 11).  Jones remained as manager.  (*Id*.).  This arrangement was approved by the DFI.  (*Id*.).

On June 1, 2009, Saalwaechter sent a letter to Tarpey, asking DFI to promptly process his application to ensure that a pawn business could operate continuously at the property.  (Plaintiffs' Ex. 16).  On July 28, 2009, Tarpey sent Saalwaechter a second letter, asking him to answer additional questions about his application.  (Plaintiffs' Ex. 19).  In the letter, Tarpey informed Saalwaechter that Jones, due to his criminal record,

---

[1] The letter explained that a background check conducted by the FBI was a newly implemented DFI policy for consumer licenses.  (Defendants' Ex. H).

did not "meet the character and fitness requirement to be a manager of the pawn shop. A qualified, experienced manager must be identified prior to consideration of a license." (*Id.* at 3).

On August 25, 2009, as part of the application process, Tarpey and Schroeder interviewed Saalwaechter. (Plaintiffs' Ex. 25). During the interview, Schroeder explained that DFI's background check disqualified Jones from working at the store. He explained that the DFI's previous background check on Jones did not show a previous felony, as the check was limited to the State of Kentucky. (*Id.* at 35; *see also* Tarpey Dep. at 39 (testifying that in April 2009, the DFI "did not know about Mr. Jones' felony convictions"). Schroeder informed Saalwaechter that the nature of Jones' charges revealed "the exact things that we can't have at our pawn shops." (Plaintiffs' Ex. 25 at 35).

On September 9, 2009, during the pendency of Saalwaechter's application, David Mills became Director of DFI. (Deposition of David Mills at 5). Just days after his appointment, Director Mills met with Tarpey, Schroeder, and former DFI Director, Judith Ripley, to discuss a number of issues, including the Saalwaechter application. (*Id.* at 5-6). Ripley told Mills that she would not approve Saalwaechter's application under delegated authority because of the ambiguities surrounding Saalwaechter's purchase of the property; her concerns relating to a possible straw ownership; the pawnbroker application was incomplete; and she did not approve of Jones serving as manager. (Ripley Dep. at 14, 18-19, 27-31, 44).

Four days after his appointment, Mills declined to approve the application pursuant to his delegated authority, and referred the application to the full DFI Board. (Deposition of David Mills at 9-12). This was the first time in Tarpey and Schroeder's tenure with DFI that a pawn license application had gone to the DFI Board for a vote. (Deposition of John Schroeder ("Schroeder Dep.") at 12).

On September 22, 2009, Tarpey informed Saalwaechter of Mills' decision, and that his application would be presented to the Board members for their review. (Defendants' Ex. O). The letter notified Saalwaechter that the Board would make the final decision on whether a license would be issued, and if issued, under what restrictions. (Id.). "The possibilities for licensure" included "[a]proving the application with a Memorandum of Understanding (MOU) as proposed (attached), and/or any other terms that the Board may wish to add/amend." (Id.). The letter asked Saalwaechter to notify Tarpey whether he wished to go forward with the application and, if so, whether he agreed to the MOU proposed by DFI. (Id.). The MOU provided, among other things, that "in exchange for the Department considering approval of [Plaintiffs'] pawn license application," Saalwaechter would not employ Jones "in any capacity." (Plaintiffs' Ex. 26). If he disagreed, he was to set forth specific objections to the MOU. (Id. at 2). In his reply letter, Saalwaechter expressed his desire "to employ Mr. Jones . . . Certainly, however, I will accept the MOU if all consideration for approving my application without it has failed." (Plaintiffs' Ex. 27 at 2).

On October 2, 2009, Schroeder circulated a memorandum to DFI Board Members. (Plaintiffs' Ex. 28). Schroeder stated that DFI staff members were comfortable with

8

Saalwaechter's financial standing, competence, and business experience. (*Id*. at 1-2). However, they were concerned that Saalwaechter could not meet the character and fitness element of the licensing statute (*i.e*., that the business will be operated honestly and fairly). (*Id*.). Schroeder expressed concern over Saalwaechter's unconventional purchase of the Fares Avenue property, and specifically that Saalwaechter may be trying to continue the "straw license" operation that took place when Evansville Pawn operated on the property. (*Id*. at 3-4). Schroeder also informed the DFI Board that Saalwaechter and Carroll were under investigation by the Owensboro, Kentucky Police Department over allegedly fraudulent business loans, but that no state or federal charges were anticipated. (*Id*. at 3). Schroeder finally conveyed the DFI staff's preference that Saalwaechter's application be denied, and that the DFI staff had made "repeated efforts to dissuade him" from pursuing the application. (*Id*. at 5).

Tarpey was responsible for creating a "pre-meeting packet," which conveyed all relevant information about Saalwaechter's application and the issues he would ask Saalwaechter to discuss at the DFI Board Meeting. (*See* Defendants' Ex. L). Saalwaechter was able to include any information he wished as part of the packet. (*Id*. at 3). Despite Schroeder's recommendation, the members of the DFI Board were aware that Saalwaechter was agreeable to signing the MOU, (*id*. at 5), and both Mills and Richard Rice, Chairman of the Board, told Schroeder that they thought the Board would grant Saalwaechter's application if Saalwaechter agreed to the MOU. (Schroeder Dep. at 20, 35-36).

Saalwaechter finally appeared before the DFI Board on October 8, 2009, to answer a multitude of questions regarding, *inter alia*: (1) his prior ownership of Owensboro Petroleum Agency; (2) how he came to own the Fares Avenue property, but not the pawn shop, and the various transactions involving the same; and (3) his business relationships with Carroll, the Kamufs, and Jones.  (Defendants' Ex. M).  Saalwaechter explained that he "had no intensions of wanting to operate a pawnshop or to get into the pawnshop business," but he was committed to making the best of the situation.  (*Id*. at 8-9, 36-37, 63).

The DFI staff and Board Members expressed serious reservations about his application.  Schroeder stated that theft and drug problems were traditionally problems associated with pawnshops.  (*Id*. at 47-49).  Thus, Jones' criminal record involving theft and drugs, and the fact that he lied during the investigation of Carroll's pawnbroker license (see infra.), caused the DFI great concern.  (*Id*. at 43-61).  During most of that discussion, Saalwaechter defended Jones.  (*Id*. at 45-61).  In addition, Mills expressed concern over the lack of clarity in Saalwaechter's business transactions as they pertained to the property.  (*Id*. at 64).  Rice conveyed concern that Saalwaechter was pursuing a new pawn license while he was a defendant in five lawsuits and a plaintiff in a suit against Carroll.  (*Id*. at 26-38, 67).  At the end of the discussion, the DFI Board unanimously voted to deny Saalwaechter's application, more than six months after the initial application.  (*Id*. at 68, 72).  Schroeder testified that although "six months seems like a long time," it was "not out of the ordinary."  (Schroeder Dep. at 85).  In addition,

Schroeder explained that the DFI "had other concerns we were dealing with, including the failure of the second largest bank in the state." (*Id.*; *see also* Ripley Dep. at 13 (explaining that the bank closure took "a very large part of our day-to-day process")).

On October 21, 2009, Saalwaechter promptly filed an appeal for a hearing before an administrative law judge. (Defendants' Ex. N). While the appeal was pending, Saalwaechter signed an MOU that was virtually identical to the one he was presented in September 2009; it excluded Jones from employment at Fares Pawn. He was subsequently granted a pawnbroker license effective July 2010, more than fifteen months after Plaintiffs' initial application. Since that time, Saalwaechter has operated Fares Pawn without incident and received judgment in his favor in three of the five lawsuits that were pending against him at the time of the DFI Board meeting. (Plaintiffs' Exs. 36-37, 43).

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325, (1986). The non-moving party, however, may not rest on mere allegations or denials in its pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. Stated differently, only disputes over material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will preclude the entry of summary judgment. *Id*. at 248. When determining whether a genuine issue of material fact exists, the court views the record and all reasonable inferences in the light most favorable to the nonmoving party. *Id*. at 255.

## III.    Federal Claims

Plaintiffs bring two Section 1983 claims against the Individual Defendants, both of which arise under the Fourteenth Amendment to the United States Constitution. First, they allege the Individual Defendants violated the Plaintiffs' right to due process of law by denying their pawnbroker application based upon criteria not enumerated under Indiana's pawnbroker statute, Indiana Code § 28-7-5-1 *et seq.* Second, they allege the Individual Defendants violated Plaintiffs' right to equal protection of the law by intentionally treating them differently than other pawn license applicants. They bring these claims against the Individual Defendants in both their individual and official capacities.

Section 1983 provides a private cause of action against a person, who acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (quoting 42 U.S.C. § 1983). To sustain a Section 1983 claim against

12

government officials, Plaintiffs must demonstrate:  (1) they had a constitutionally protected right; (2) they were unconstitutionally deprived of that right; (3) defendants intentionally caused the deprivation; and (4) defendants acted under color of state law in doing so.  *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993) (citation omitted).

The issue of who may be a "person" subject to suit under Section 1983 has been the subject of several Supreme Court decisions.  In *Will v. Mich. Dep't of State Police*, the Supreme Court held that neither the State, nor state officials acting in their official capacity, are "persons" within the meaning of Section 1983 because, in that role, they assume the identity of the State.  491 U.S. 58, 71 (1989).  Two years later, in *Hafer v. Melo*, the Supreme Court clarified that state officials sued in their individual capacities are "persons" subject to suit.  502 U.S. 21, 27 (1991) ("A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term "'person.'").  Consequently, Plaintiffs' claims for damages under Section 1983 against the Individual Defendants in their official capacities may not be maintained.  The court now turns to Plaintiffs' claims against the Individual Defendants in their individual capacities.

### A.    Due Process

A procedural due process claim requires a plaintiff to establish: (1) the violation of a liberty or property interest (2) without adequate due process of law.  *Halfhill v. Northeast Sch. Corp.*, 472 F.3d 496, 500 (7th Cir. 2006).  The Individual Defendants contend that Plaintiffs do not have a property interest in a pawnbroker license entitled to

constitutional protection, and thus, Plaintiffs' due process claim based upon the DFI

Board's decision denying their application for a pawnbroker license has no merit.

In *Board of Regents v. Roth*, 408 U.S. 564 (1972), the Supreme Court held that

property interests are not created by the Constitution; instead, "they are created and their

dimensions are defined by existing rules or understandings that stem from an independent

source such as state law." *Id*. at 577.  Whether one has a property interest in a license

depends upon whether the person has a "legitimate claim of entitlement to it" which, in

turn, "depends in large part on the amount of discretion given to state licensing

authorities." *Kellogg v. City of Gary*, 562 N.E.2d 685, 695 (Ind. 1990).  Where, as here,

the source of the alleged property right, Indiana Code § 28-7-5-8[2], provides that the DFI

"shall issue" an applicant a pawnbroker license if the applicant meets the conditions set

forth in the statute, the DFI "'has no discretion in the matter but must issue the license.'"

*Id*. (quoting *Matthews v. State*, 148 N.E.2d 334, 337 (Ind. 1958)).

Plaintiffs argue that they met all the requirements for a pawnbroker license under

Indiana Code § 28-7-5-8; therefore, the DFI Board was duty bound to issue them a

---

[2] Indiana Code § 28-7-5-8(a) provides, in relevant part:
(a)   Upon an applicant's filing of the application . . . and payment of the license fee, if
the department finds the financial standing, competence, business experience, and
character of:
    (1)  the applicant . . . ;
    (2)  each director, executive officer, or manager of the applicant . . .
are such that the business will be operated honestly, fairly, and efficiently and that
the convenience and needs of the public exist for the operation of the business in
the community wherein the applicant proposes to operate, it shall issue and
deliver a license to the applicant, which license shall authorize the applicant to
engage in the business of pawnbrokering.

license.  Plaintiffs' argument fails for one primary reason – the statutory criteria for

obtaining a pawnbroker license calls on the DFI to evaluate subjective factors such as an

applicant's character.  *See, e.g., Indiana Family & Social Servs. Admin. v. Jones*,  691

N.E.2d 1354, 1356 (7th Cir. 1998) (noting that the license issuance statute for home day

care facilities "is almost wholly objective, leaving very little discretion to the issuing

agency").  The transcript of the DFI Board meeting establishes that Board determined

Plaintiffs did not meet the statutory criteria because:  (1) Jones did not meet the character,

honesty, and fairness requirements; (2) Saalwaechter was a defendant in a number of

pending lawsuits; and (3) the circumstances surrounding Saalwaechter's purchase and

ownership of the property were highly unusual and difficult to understand. (*See

generally*, Defendants' Ex. M).  These were valid reasons to conclude Plaintiffs'

application did not meet the statute's criteria.  Once the DFI Board made this

determination, it had the lawful authority to deny their application.  The court therefore

finds, as a matter of law, that Plaintiffs had no legitimate claim of entitlement to a

pawnbroker license in October of 2009.

Even if Plaintiffs had a legitimate claim of entitlement to a pawnbroker license,

Plaintiffs received notice and a meaningful opportunity to be heard.  *Cleveland Bd. of

Educ. v. Loudermill*, 470 U.S. 532, 545 (1985).  Saalwaechter was (1) interviewed by the

DFI; (2) allowed to submit evidence for the pre-meeting packet that was distributed to

DFI Board Members; (3) answered numerous questions at length during the October

2009 Members Meeting, as evidenced by the seventy-two (72) page transcript of the

question and answer colloquy; and (4) appealed the DFI Board's decision to an

administrative law judge.  Indeed, the process worked, as Saalwaechter was able to settle the appeal and obtain a license.  While Saalwaechter complains that he did not get to cross-examine the DFI Board Members or make a case on his own behalf, there is no statutory requirement  that first-time applicants be allowed to engage in an adversarial proceeding.  *See* IND. CODE § 28-7-5-8(b)(3) ("If the department denies the application, its shall notify the applicant of the denial.  The department may hold a public hearing if the department considers a hearing necessary.").  The court's conclusion is also supported by Supreme Court precedent:  "'[S]omething less' than a full evidentiary hearing is sufficient prior to adverse administrative action."  *Loudermill*, 470 U.S. at 545 (quoting *Matthews v. Eldridge*, 424 U.S. 319, 343 (1976)).

Plaintiffs' due process claim against the Individual Defendants suffers from other defects as well.  First, Tarpey and Schroeder investigated Plaintiffs' application and provided the results of their investigation to the DFI Board.  Thus, even if, as Plaintiffs' complain, Tarpey and Schroeder were hostile to Plaintiffs' application before and during the October 2009 Members Meeting, they had no ability to approve or deny the application.  That decision rested solely with the DFI Board.  Moreover, the undisputed evidence reflects that even after Schroeder's October 2009 memorandum to the DFI Board, which Plaintiffs' characterize as containing a "plethora of misinformation," Mills and Rice thought that Saalwaechter's application would be approved if Saalwaechter agreed to sign an MOU.  In the absence of any evidence suggesting that Tarpey and/or Schroeder personally participated in the deprivation of Plaintiffs' right to procedural due process (assuming there was one), a Section 1983 due process claim cannot be asserted

16

against them.  *See Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000) ("An

individual cannot be held liable in a § 1983 action unless he caused or participated in

[the] alleged constitutional deprivation.") (quoting *Starzenski v. City of Elkart*, 87 F.3d

872, 879 (7th Cir. 1996))).

This same reasoning applies with equal force to Director Mills.  Indeed, Mills did

not deny Plaintiffs' application; he simply refused to approve it under his delegated

authority.  Although this procedural decision was not typical, the evidence reflects the

decision was reasonable given Director Mills' inexperience and former-Director Ripley's

testimony that she would not have approved Plaintiffs' application under her delegated

authority.

Because Plaintiffs cannot show they had a legitimate claim of entitlement in the

approval of their license application, Plaintiffs received notice and a meaningful

opportunity to be heard, and the Individual Defendants did not personally participate in

any alleged constitutional deprivation, Plaintiffs' due process claim fails as a matter of

law.

### B.    Equal Protection Claims

Plaintiffs bring an equal protection claim by a "class of one," as neither Fares

Pawn nor Saalwaechter are members of a protected class.  A class of one equal protection

claim has two elements: (1) the plaintiff alleges that he has been intentionally treated

differently from others similarly situated and (2) there is no rational basis for the

difference in treatment.  *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir.

2004) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, (2000) (per curiam.)).

Here, Plaintiffs allege they have been intentionally treated differently than other pawn applicants, and DFI cannot show any rational basis for the difference in treatment.

Similarly situated individuals "must be very similar indeed." *McDonald*, 371 F.3d at 1002 (citing *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)).  In order to succeed, Plaintiffs "must demonstrate that they were treated differently than someone who is *prima facie* identical in all relevant respects." *Purze*, 286 F.3d at 455. In *McDonald*, *supra.*, the Seventh Circuit likened this requirement to the similarly situated requirement in a Title VII employment discrimination case. *McDonald*, 371 F.3d at 1002 (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)). Key to this inquiry is whether the employees dealt with the same supervisor, were subject to the same employment standards, and engaged in similar conduct. *Id.* (citing *Radue*, 219 F.3d at 617-18).  As applied here, the court looks to whether the alleged comparators were subject to the same regulatory standards and engaged in the same conduct.  Whether two individuals are similarly situated is a question of fact. *Id.*  "However, a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *Id.*

The court now turns to Plaintiffs' alleged comparators:  Deal Brothers, LLL, Parlor City Pawn, Evansville Pawn, and various other pawn applicants.

### 1.     Deal Brothers, LLC

On September 1, 2009, George Hicks, a DFI compliance officer, visited Deal Brothers in Evansville, Indiana.  (Plaintiffs' Ex. 32 at FaresPawn000296).  At that time, Deal Brothers operated as a buy-sell business.  (*Id*.).  Hicks learned from the owner that

18

Deal Brothers was purchasing items, adding a mark-up and sales tax, and immediately selling it back to the customer on a 30-day "layaway" plan. (*Id*.).  Hicks informed  the owner that its buy-sell arrangement with its customers constituted a pawn loan and required a pawnbroker license.  The owner agreed to cease and desist from that type of activity until such time as Deal Brothers applied for and received a pawnbroker license. (*Id*.).

In November of 2009, one of the owners of Deal Brothers got into an argument with a customer whose girlfriend had sold his speakers and an amp for cash two weeks earlier.   (*Id.* at FaresPawn000433). The owner "shoved a handgun into the customer's throat and pushed him out the door."  (*Id.*).  Deal Brothers' owner admitted that he had not kept proper paperwork on that customer's transaction because she "needed the cash quickly." (*Id*.).  Members of the Evansville Police Department ("EPD") were called to the scene, and explained to the owner "what he can and can't do with his gun." (*Id*)  The DFI later contacted the EPD about the incident, and learned that charges were not brought against the owner. (*Id.* at FaresPawn000416).

DFI records show that Deal Brothers submitted its license application on December 10, 2009.  (*Id*. at FaresPawn000407-410).  During an interview with DFI on January 20, 2010, Deal Brothers was asked to provide an explanation of the gun incident, which it did that very day.  (*Id.* at FaresPawn000412, 413, 416).  Deal Brothers' owner stated that a young woman, who was the daughter of a good friend, wanted to pawn some items because she needed the money to help post her boyfriend's bond.  (*Id*. at FaresPawn000412).  Deal Brothers' owner explained that he could only buy them from

her, and she agreed to sell them.  (*Id*.). When the woman's boyfriend came to Deal

Brothers to get them back, he informed the owner that she did not have permission to sell

those items.  (*Id*. at FaresPawn000412).  He became loud and angry, calling the owner an

"MF" numerous times.  (*Id*.).  The owner explained that he pulled the gun out of fear for

his life.  (*Id*.).

On February 12, 2010, Deal Brothers executed an MOU with Director Mills,

stating that Deal Brothers would comply with all federal and state laws. (*Id*. at

FaresPawn000405).  Mills approved the application under his delegated authority on

March 12, 2010.  (*Id*. at FaresPawn000403-404).  Thus, only four months passed between

the time Deal Brothers applied for a pawnbroker license and was granted a license under

delegated authority.

Plaintiffs claim they are similarly situated to Deal Brothers because Deal Brothers

violated the pawn broking statute by pawning items via a layaway scheme and made a

pawn loan even after being informed by the DFI to cease such transactions.

There is no evidence that the owners of Deal Brothers knew they were violating

the law during the time they were operating as a buy-sell business.  In addition, the pawn

loan allegedly made after the DFI's cease and desist order is a reference to the November

2009 gun incident noted above.  The record reflects that the owner of Deal Brothers did

not admit to making a pawn loan; his version of events is that he informed the woman

that Deal Brothers could only buy the items.  As there is no evidence from the woman or

her boyfriend to contradict his statement, the DFI could have reasonably believed his

version of events, particularly since charges were never brought by the EPD against Deal

20

Brothers for the gun incident.  Furthermore, unlike Plaintiffs, Deal Bothers' property did not have a storied past involving the receipt of stolen property; Deal Brothers did not run a straw operation; Deal Brothers did not lobby for an individual with a criminal record to manage its pawnshop; and Deal Brothers' owners, unlike Saalwaechter, actually wanted to own a pawn shop.  Therefore, Deal Brothers is not valid comparator.

### 2.  Parlor City Pawn

Parlor City Pawn, located in Bluffton, Indiana, was previously owned by Tim and Heidi Bryant.  (Affidavit of Chase Fiechter ("Fiechter Aff.") ¶ 3).  The Bryants were forced to surrender their license after Tim was arrested for selling a pawned firearm to a third party with knowledge that a convicted felon would receive the firearm.  (Plaintiffs' Ex. 33 at FaresPawn002789-90).  Tim's son, Clayton Bryant, was convicted of a misdemeanor charge related to inadequate firearms recordkeeping.  (Fiechter Aff. ¶ 8).

In February of 2011, Chase Fietcher contacted the DFI about acquiring a pawn license to operate Parlor City as a pawn shop again, describing himself as a "good friend" of Tim who was buying Tim's business.  (Plaintiffs' Ex. 33 at FaresPawn0002741).  Fietcher initially insisted on having Clayton serve as manager, raising concerns within the DFI that Fietcher was applying for a straw license.  (Plaintiffs' Ex. 33 at FaresPawn002594).   Nonetheless, after Fiechter agreed not to employ Clayton, Mills approved Fiechter's license under his delegated authority on October 20, 2011.  (*Id.* at 47-48).  As Fiechter applied for a pawnbroker license on May 10, 2011, (Fiechter Aff. ¶ 1), Fiechter's application took five months for the DFI to approve.

Both Saalwaechter and Fietcher had relationships with the prior owners of the pawn shops they wished to operate, who were forced to surrender their pawnbroker licenses to the DFI.  In both cases, the DFI was concerned that the applicants were seeking straw licenses, both advocated for managers with a criminal record, and their respective licenses were approved once they agreed not to hire their manager of choice.  Yet, Parlor City received its pawnbroker license pursuant to delegated authority five months after its application; whereas Plaintiffs' application was approved fifteen months after the initial application.

The court agrees with Plaintiffs that, despite the absence of past straw licenses at the Parlor City site, the circumstances surrounding the respective applications were sufficiently similar for Parlor to be a valid comparator.  However, no rational trier of fact could conclude that the parties were treated differently or, if they were, that the Individual Defendants acted irrationally in doing so.  Both applicants were granted their licenses once they unambiguously agreed not to hire a manager with a criminal record.  While Parlor City's application-to-approval time was five months, compared to fifteen months for Plaintiffs, the time gap may be explained by Saalwaechter's initial, incomplete application or his continued desire to have Jones serve as manager. Plaintiffs are correct that Fiechter was presented with an MOU earlier in the process than Saalwaechter, and Mills approved Parlor's application pursuant to his delegated authority.  However, Mills had two years, rather than several days, of experience by the time Parlor City's application was submitted, and DFI's resources were not strained by trying to handle the state's second largest bank failure.  Since Plaintiffs have failed to

22

rebut every rational basis for any alleged disparate treatment they suffered vis-à-vis Parlor City, their equal protection claim cannot be sustained using Parlor City as a comparator.

### 3.    Evansville Pawn

Plaintiffs note that Evansville Pawn's license was granted pursuant to Ripley's delegated authority just thirty-six days after the initial application, despite Jones being listed as manager and Tarpey allegedly being aware of Jones' criminal past.  (Plaintiffs' Ex. 6 at 6; Plaintiffs' Ex. 20 at 2).  Plaintiffs argue that because the DFI was aware of Jones' criminal record even before Carroll's pawnbroker application and granted Carroll and Evansville Pawn a license anyway, Evansville Pawn is a valid comparator.

To say the DFI's knowledge of Jones' criminal record pre-dates even Carroll's application is inaccurate.  As noted previously in this Entry, both Tarpey and Schroeder testified that at the time Carroll applied for his pawnbroker license, the DFI was unaware of Jones' felony charges in the State of Indiana. (Tarpey Dep. at 37 ("The state police criminal background check that we had didn't show anything."); Plaintiffs' Ex. 25 at 35 (Schroeder: "[N]othing showed up in Jones' Kentucky background check.  Had it shown up he wouldn't have been allowed to be working there at the time.").  The DFI began FBI background checks at the time Plaintiffs' filed their application.  (*See* Plaintiffs' Ex. H).

Furthermore, as Defendants point out, Carroll and Jones lied to DFI during the license application process of Evansville Pawn, representing Jones as manager and Jeremy Kamuf as a person who just helped out in the store a few hours a week. (Defendants' Ex. M at 50-53).  In reality, Jeremy Kamuf was running the shop, had keys

23

to the store, was a signatory on the checking account, and thought he owned the store. (*Id*.).  Saalwaechter acknowledged that "[Jones] may have lied" about some things.  (*Id*. at 55).  By the time Saalwaechter applied for a license, there was a history of straw licenses at the property, among other things, perpetrated by individuals with whom Saalwaechter had prior business relationships.  None of these conditions were present or known to DFI when Carroll applied for Evansville Pawn's license.  Accordingly, Evansville Pawn is not similarly situated to Plaintiffs.

### 4.    Other Pawn Licenses

Plaintiffs finally note that the other nine pawn licenses DFI granted between 2007 and 2010 were all granted based on delegated authority, and "the average wait time from application to approval . . . was 83 days."  (Plaintiffs' Ex. 14).  They argue that disparities in approval and wait time are evidence of an equal protection violation by the Individual Defendants.

Plaintiffs' Exhibit 14 is a chart listing eleven pawn shops, including Evansville Pawn and Parlor City, and includes an application date and the number of days that elapsed between the application date and the date of approval. To the extent Plaintiffs' Exhibit 14 is properly authenticated and admissible into evidence, Plaintiffs have designated no evidence to establish that these other applicants – Pawn Unlimited, Quick Pawn, Cash N Pawn, Red's Worldwide Pawn, Team 100, McKinley Pawn, Worldwide Pawn, 1st Choice Pawn, and KT Pawn – are similarly situated to them.  For example, the court has no evidence regarding where the pawn shops are located, whether a pawn shop was located on the property prior to the applicants' applications, whether the applicants

24

or the applicants' proposed managers' had a criminal record, and whether the applicants were honest during the DFI's investigation.  Without this evidence, the court cannot say, as a matter of law, that the applicants listed on Plaintiffs' Exhibit 14 were similarly situated to Plaintiffs, much less whether they were *intentionally* treated differently.

### 5.   Conclusion

Plaintiffs have failed to establish that the Individual Defendants intentionally treated them differently from Deal Brothers, Evansville Pawn, and the other pawn licensees listed on Plaintiffs' Exhibit 14.  The court further finds that a rational basis exists for the difference in treatment between Plaintiffs and Parlor City.  Accordingly, Plaintiffs' equal protection claim against them fails as a matter of law.

## IV.   State Law Claims

Plaintiffs have also sued the State Defendants, alleging that DFI's delay in processing Plaintiffs' pawnbroker license and their denial of Plaintiffs' pawnbroker license amounted to intentional infliction of emotional distress ("IIED") and intentional interference with business relations.  Although there is no federal claim left upon which the court may assert original jurisdiction over Plaintiffs' claims, the court elects to take supplemental jurisdiction over Plaintiffs' state law claims, as they arise out of the same set of facts, substantial judicial resources have been allocated to this case, and remanding the case to state court at this late juncture would be unfair to the parties.  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172-73 (1997); *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994).

**A.     Immunity**

The State Defendants first argue that they are immune from liability under the

Indiana Tort Claim Act ("ITCA").  It provides, in relevant part:

> A governmental entity or an employee acting within the scope of the
> employee's employment is not liable if the loss results from the following:
>  . . .
>
> (11) The issuance, denial, suspension, or revocation of, or failure or refusal
> to issue, deny, suspend, or revoke any  . . . license . . . where the authority is
> discretionary under the law.

IND. CODE § 34-13-3-3(11).   As previously discussed in Section III.A. of this Entry, the

DFI has the discretionary authority to grant or deny an application for a pawnbroker

license by virtue of Indiana Code § 28-7-5-8.  In addition, when the DFI Board initially

denied Plaintiffs' pawnbroker application, they were acting within the scope of their

employment.  Accordingly, the State Defendants are entitled to immunity under the

ITCA.

Even if immunity did not attach, Defendants would still be entitled to summary

judgment on Plaintiffs' state law claims.

**B.     Intentional Infliction of Emotional Distress**

To prevail on an IIED claim, Plaintiffs must show that Defendants' conduct:  (1)

was extreme and outrageous; and (2) intentionally or recklessly caused Plaintiffs severe

emotional distress.  *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (quoting

RESTATEMENT (SECOND) OF TORTS § 46 (1965)).  Indiana courts impose a high burden

on a plaintiff, allowing IIED claims to be sustained only if the conduct is "so outrageous

in character, and so extreme in degree, as to go beyond all possible bounds of decency,

26

and to be regarded as atrocious, and utterly intolerable in a civilized society."

*AutoXChange.com, Inc. v. Dreyer & Reinbold, Inc.*, 816 N.E.2d 40, 52 (Ind. Ct. App.

2004).  Plaintiffs must prove "an average member of the community" would cry

"Outrageous!" upon hearing of Defendants' conduct.  *Gable v. Curtis*, 673 N.E.2d 805,

810 (Ind.Ct.App. 1996).

The outrageous conduct, as argued by Plaintiffs, is the DFI Board's decision to

deny them a pawnbroker license.  Without belaboring the point, the DFI Board's decision

falls well short of this exacting standard, particularly where, as here, Plaintiffs' were

granted a license at a later date.  Plaintiffs' IIED claim must be dismissed.

### C.     Intentional Interference with Business Relations

Plaintiffs argue that Saalwaechter had established relationships with pawn

customers while liquidating Evansville Pawn, and that by delaying and denying

Plaintiffs' pawnbroker license, DFI intentionally interfered with those relationships.

To sustain an intentional interference claim, Plaintiffs must establish:  (1) the

existence of valid relationships; (2) that Defendants knew about; (3) with which

Defendants intentionally and illegally interfered; (4) without justification; and (5)

Plaintiffs suffered damages.  *Smith v. Biomet, Inc.*, 384 F.Supp.2d 1241, 1249 (N.D. Ind.

2005).  For the State Defendants to have acted without justification, Plaintiffs "must

show that the [State Defendants] acted exclusively to harm the [Plaintiffs'] business

interests."  *Id*. (citing *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268,

1272 (Ind.Ct.App. 2000)).  While Indiana courts have not defined what constituted

"illegal conduct," case law has interpreted the term to include more than criminal acts.

*Smith*, 384 F.Supp.2d at 1252 (citing *Syndicate Sales, Inc. v. Hampshire Paper Co.*, 192

F.3d 633, 641 (7th Cir. 1999)).  For example, a claim for invasion of privacy and IIED

meet the requirement.  *Id.*  "Illegal conduct," however, does not include a claim for

breach of contract.  *Id.*

    Plaintiffs cannot establish all five elements of their claim.  First, there was no valid

business relationship between Saalwaechter and the customers of Evansville Pawn.

Although Saalwaechter may have established relationships with customers while he was

liquidating Evansville Pawn as the appointed liquidating agent, Saalwaechter did not

purchase Evansville Pawn or its goodwill. (Defendants' Ex. J; 2012 Saalwaechter Dep. at

36).  Thus, the customers of Evansville Pawn were not his customers.

    In addition, the State Defendants did not intentionally and illegally interfere,

without justification, in delaying a decision on, and initially denying, Plaintiffs'

pawnbroker application.  Mills' conclusion that he could not approve Plaintiffs'

application through his delegated authority, as previously discussed, was reasonable

given his concerns about the application and his inexperience as DFI Director.  It

certainly was not arbitrary, capricious, or contrary to law.  Similarly, the DFI Board

reasonably determined that the history of the Fares Avenue property that preceded

Plaintiffs' pawnbroker application, the ambiguities surrounding the sale of the property to

Saalwaechter, and Saalwaechter's choice to have Jones as manager, among other

concerns, meant that Plaintiffs' application could not meet the character requirement.

IND. CODE § 28-7-5-8(a).  Once the Board determined the application did not meet all

statutory requirements, it had statutory authority to deny Plaintiffs' application.

Plaintiffs' intentional interference claim must be dismissed.


**V.      Conclusion**

For the reasons set forth above, the court finds no genuine issue of material fact

exists on Plaintiffs' federal constitutional and state law claims.  Accordingly, the court

**GRANTS** Defendants' Motion for Summary Judgment (Docket # 74).


**SO ORDERED** this 26th day of September 2013.

 

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.